It is DACA 24-1359, counsel, please proceed when you're ready. Good morning, your honors and counsel. John Arcisi from the Federal Public Defender's Office in Denver, appearing for appellant Antoine Rabin. The issue in this case is whether officers had reasonable suspicion to conduct a protective sweep. That is a search of a vehicle compartment for weapons. The doctrine requires the government to make two showings. First, that there's reasonable suspicion that a person is presently dangerous. And second, that there's reasonable suspicion to believe that a weapon may be found in a vehicle, and also that the person may gain immediate access to it. So I want to start with the first prong today. And in finding reasonable suspicion that Mr. Rabin was dangerous and also armed, the district court relied on four principal factors that I think we all sort of agree on here, right? Mr. Rabin's purported gang affiliation, the neighborhood, his girlfriend's brother being parked across the street, and an ankle monitor. The district court described this as a close call and a close case. And we think the district court simply made the wrong call because neither individually nor in totality do these factors add up to a reasonable suspicion that Mr. Rabin himself was armed and dangerous. Now, the crux of our argument is pretty straightforward here, right? What we think is missing is what we see in other cases, right? That is factors that are individualized and particularized and objective to Mr. Rabin and this stop, right? That would lead to suspicion that he is armed and dangerous. And I think if we look at the Hammond case that's discussed in the briefing, that is particularly instructive here. Because what you have there is interactions between these sort of generally applicable status factors, location factors that are indisputably, individually insufficient to establish reasonable suspicion with something that the defendant, something about the defendant himself, or something that the defendant himself did during the stop, right? Had the defendant been, or the suspect at that point, been pat searched? I'm sorry. Had they patted the defendant down to determine whether he had a weapon before they talked to him? In our case or in Hammond's? Yes, in your case. No, they talked to him extensively before taking him out of the vehicle, patting him down. And they did pat him down when they got him out of the vehicle. They did. They frisked him. And then at that point, they knew he didn't have a weapon on himself. That's correct. All right. Yeah. And at that point, they hadn't yet searched the vehicle. So when they searched the vehicle, they knew that he didn't have a weapon on himself. They knew that he did not have a weapon on himself. All they learned from that frisk, which we haven't challenged the frisk, although we certainly could have, as in this way, the same standard applies, right, to a frisk or a sweep of the vehicle. It's the question, is the person armed and dangerous? The only thing they learned from the frisk itself is, as you point out, he doesn't have a weapon on him, and B, that he had an ankle monitor, right? But the ankle monitor tells us exceedingly little in this case and really, I think, adds no probative value to the likelihood that Mr. Rabin would be armed and dangerous. The district court's decision on this below really doesn't explain why it's probative. It simply just observes that he had an ankle monitor. And I think that's with good reason, right? People have ankle monitors for all sorts of reasons. They may be charged with a crime, including nonviolent ones. They may be on pretrial release, meaning there's been a judicial adjudication that they don't present a risk to the community. They may be, right, on immigration-related release. They may be being monitored for drinking or location. There are all sorts of reasons, and we just don't have any information here as to what Mr. Rabin's ankle monitor was for. Now, as we pointed out in the district, in our briefing, certainly officers could have explored that further. And if they had, maybe they would have developed additional bases to support their reasonable suspicion inference. But they didn't. They jumped immediately from frisking Mr. Rabin to searching the car. And, you know, again, to sort of go back to the Hammond decision that I was talking about before, and it goes to Judge E. Bell's point, which is or Judge E. Bell's question, which is in Hammond, you have not only the fact that the defendant there was a known gang member who was sort of visibly displaying his gang affiliation, but he the officers knew that he specifically had been a suspect in a prior weapons case, that he'd been arrested in a different weapons case, that that vehicle had been associated with one of those weapons cases. And so, again, under those circumstances, a gang affiliation, which is indisputably, again, not enough, as the court said in Hammond and repeated a few weeks ago in a case called McGregor. It's additive to the likelihood that this individual may have been armed and dangerous because just as he had likely possessed weapons in the past, perhaps there was a reasonable basis to believe he might then. We have none of that here. Counsel, you're responsible for your own organization. I don't want to intrude on that, but I know we're now down to nine minutes. May I tell you my biggest concern so that you don't run out of time, but maybe you could address it. And that is what the justification was for searching the car, because they had determined that he did not have a weapon. And they were not going to let him go back to the car until the search was over, until he was released and free to go. So once he was released and free to go, did they still have any authority at that point to search the car? And if they felt he was going to go back to the car before he was released and free to go, then, of course, he was still under the search. And you could still use the search mantra to say, was it necessary and reasonable? But once they say, OK, you're free to go, now you can get back in the car for the first time, what hook do they still have over him to then say, oh, but wait a minute, even though you're free to go and you're no longer a to-be-searched suspect, we just better make sure there's no weapons in the car. Yeah, so I think it's an important point because it goes to sort of the foundational principles here, as well as the impact, I think, of extending Long beyond what the Supreme Court in Long itself cautioned against, this not being sort of every traffic stop entails a protective sweep search of a vehicle. Right. Because as you point out, officers can always ask someone to get out of the vehicle under Pennsylvania v. Well, it does. As long as you are still in the traffic stop mechanism, you can search the car. But when you say to somebody, OK, you're free to go, doesn't that conclude the search? And do you still have any hook then to say, but wait a minute, now we still want to search that car? Yeah. So to more directly answer your question, it goes directly to the question, right, in Michigan v. Long, which is this that we are talking here about a balancing between interests, right, that of officer safety and investigation and individuals for forming protections against unreasonable searches. Let me just ask a factual question because I'm not sure this is terribly helpful to me. And I want you to go back to your own strategy. Had they told him he was free to go before they said he could go back into the car? So what? The search is over. You're free to go before he was allowed back in the car or not. The only way in which they could search the car at that point was if they had reasonable suspicion. What did they say? Did they tell him? Did they tell him before they let him get back in the car, you are now free to go? Or did they say, we're still searching you, but for some reason, if you want to get back in the car, we'll let you do it? Oh, I see. No, they never indicated to him that he was free to go. What happened here was they took him out of the car, frisked him, told him they were going to fingerprint him. One officer immediately began searching the vehicle based on what they believed to be reasonable suspicion to conduct that that that sweep, which we obviously dispute. And that is the only way that they could get into the car. They never. The district court found that it was there was at least a reasonable basis. This is on the 2nd prong that there was at least a reasonable basis for the officer who conducted the sweep at the time he conducted the sweep to believe that Mr. Raymond may have been released back into the vehicle. We've disputed that the evidence does not show. I mean, the evidence will show that there was incredible argument that he was still being searched at the time. They said, well, now we, we want to look inside that car. Maybe he was being he was being prepped. He was sitting on the sidewalk about 10 feet away, 5, 10 feet away from the vehicle surrounded by other officers with his legs crossed while another officer got a fingerprint machine out of the car. While that was occurring, the other officer searched the car, found the firearm and then Mr. Raymond was still under search. Okay. That's the key I need to under that was you now proceed with your other argument. I wasn't clear about. I think it's responsive. Your honor to the foundational question right in long, which is that the only way they get into that car during this traffic stop. If they have reasonable suspicion, and again, as we've pointed out, I think those factors that are at play here are simply too generalized to in particular to suggest that Mr. Raymond himself was a danger and be likely to be armed that day. Now, the second prompt to your to your point goes to to also goes beyond sort of armedness, but to accessibility. Right. And could he have access to the vehicle? And we have challenged that, but you only need to find for us on 1, 1 of the 2 prongs right for Mr. Raymond to prevail. If there's not reasonable suspicion that he's dangerous in this stop, then that's the end of the inquiry. You can go on to the 2nd prong and our argument on that is essentially a reasonable this argument that it was unreasonable for the district court to conclude that officer Danielson believed that Mr. Mr. Raymond would have been allowed back in the vehicle, or at least would have been allowed back in an uncontrolled manner. And that's given the sense that Daniel's testimony wasn't it that he was going to be released with the citation. Yeah, that he could have been released with the site. He believed he may have been released with the citation that he could have been released to the vehicle to they could have locked the parts of the vehicle and locked it that they could have impounded the vehicle. There were a lot of permutations and the district court credit at that. And our ultimate conclusion on this is again, it's simply an unreasonable determination, given the facts are swirling here, which is that Mr. Raymond had an authority to operate the vehicle license. He had no insurance. He had no registration. There was a spilled can of beer in the back seat. And under all those circumstances, and with 6 officers present. We just think it's unreasonable if it was unreasonable to assume they would let him back into the car. Then, why would it be reasonable to search the car. It would not under long if it was unreasonable, it would essentially fail the 2nd prong of long if it was unreasonable that he would have gained access to the vehicle again with that. I'd love to reserve the remainder of my time for rebuttal. If the court has no further questions. Very well, Mr. Thank you, your honor. May it please the court Kyle Brenton for the United States. Let me just start with some factual stage setting here. So, so that we can be certain we're all on the same page. When the officer stopped Mr Ray ban, he did not have any form of identification. He told them his name. He told them his birth date. But he didn't have any state issued ID. So, the officers, you know, assuming the most benign version of this encounter. He's driving a car with no front license plate, they determine he doesn't have a driver's license. They're going to cite him and release him and that's precisely what officer Danielson testified to judge Phillips, including under questioning from the district court. Release him to do what to stand by the car. They're not going to let him drive off without a license. Are they know, and the testimony was that they were going to 1st, allow him to retreat to retrieve his property from the car. At a minimum, we know his phone was in the car because we can say we're going to allow him him not not on behalf, not on their behalf, but him to get back into that car. That was the assumption at the outset of the encounter. In order to issue him a citation, though, they needed to positively identify him. And the only mechanism they had to do that, given his lack of identification, was to fingerprint him. And their fingerprint machine is corded. It has to be plugged in in the squad car. So that's why they removed him from the car. But as my colleague noted, at no point did the justification for the original for the pullover, the original detention and prior to the valid protective sweep. This there was never a situation where he was told, OK, you're free to go. At one point, Officer Moldenhauer did say to Officer Danielson immediately before the sweep, he's good. And the district court relied on that statement as further evidence that these officers were going to, in fact, cite him and release him. Now, again, the testimony was if he had tried to drive the car off, they would have pulled him over again. They would have told him not to drive the car. What to do with the car was still in the air. But this was all a developing situation. Don't they have to make the decision, though, whether they're going to release him before they do the protective search? In other words, they can't say, well, we're waiting around here anyway for criminal history or something and nobody's really getting anything done. Let's just go do the protective search in case in case we decide that we're going to let him back into the car. That would be wrong, right? I don't think that the long long and its progeny reflect that requirement. Your Honor, I think in long itself, the officers had not decided what they were going to do with this guy at the point that they did the search. I think that's that's true as well of of Canada, of Denison, of Palmer. I don't there's really no discussion of a requirement that the officers know for certain what is going to happen to this person. I think what's required is a reasonable possibility that one of those three scenarios recognized in long, which are released to the car at the end of the search, released while the search is still going on, or possibility of breaking free. As long as one of those is met, I don't think the officers have to make a final determination of what this person's status is going to be in order to do the protective sweep. So I think with that stage set, you know, we're looking at the two familiar requirements of long, which are reasonable suspicion that he is dangerous and that he can obtain immediate access to weapons. So on dangerousness, I agree with my colleague. There are four general categories here. We have location based facts, gang affiliation, the presence of Armstrong arriving at this stop and the ankle monitor. Now, I think Armstrong's presence is the most unique factor and probably the factor that is that that carries the most weight here. I think it makes most sense in the context of location and gang affiliation. So let me start with those. As to location, we know this is a high crime area from the officer's testimony. That's independently significant, but there were specifics beyond just a generic high crime area. The officers testified that this specific area had a recent uptick in crime, including a recent uptick in shootings. And that's not an after the fact justification. I mean, if you look at the video about five and a half minutes in, Officer Danielson is talking to Mr. Raban about the recent spike in shootings and Mr. Raban agrees, frankly. So we have the recent uptick in crime. We have the location where the officers encountered Mr. Raban, which is the 7-Eleven at 36th and Quebec. The officers knew this specific location was a center for criminal activity, gang activity, gang members with weapons. Both officers had personal experience of gang members being armed at this location. Officer Moldenhauer had had an experience across the street at the Super 8 Motel where he had been shot at by a gang member. So those specifics as to location. And the third is finally that this is territory of a specific gang, which is the Bloods gang. Now that is significant because it plays into Raban's gang affiliation. So turning to that factor, we know that Mr. Raban was a member of the Trey Trey Crips. It's literally written on his face. He's got tattoos of a three under each eye, which the officers testified was reflective of membership in the Trey Trey Crips. Now, obviously in Hammond, this court held that gang membership is significant where the circumstances of the stop interact with that gang membership to create suspicion. That was absolutely the case here. First, because this is rival turf for members of the Crips. This is Blood Turf. Crip members in Blood Turf, the officers, it makes them alert to the possibility that violence may ensue. Second, the officers testified that Denver gang members are often armed. Again, that interacts with their experience at that 7-Eleven. And third, the face tattoos themselves reflect a degree of commitment to the gang above and beyond your average gang member. That's what the district court found. This was not the case of somebody maybe coincidentally wearing a blue shirt in the wrong neighborhood. I mean, he had chosen to permanently inscribe his membership on his face. So location and gang membership take us to the arrival of Deshea Armstrong at this stop. And I want to emphasize, Mr. Armstrong arrived immediately. If you watch the video, Officer Danielson is not even at the car door when you can see the white SUV turn right, go past him, drive halfway down the block, do a three-point turn, come back, and park across from the officer. So Armstrong was there. It's difficult to support any inference other than they were together because his arrival is immediate. Officers identify Armstrong immediately as a member of the Crips, a very violent member who has a history of violent offenses, and is known for being armed. Now, the next thing that happens, and again, it all happens within less than a minute, Armstrong calls Ray-Ban in the middle of this stop. In fact, you can hear Officer Moldenhauer. He's looking through the window. He's looking at that phone. The phone is ringing. He says, he's sitting right over there, but he's calling you. Now, why is this significant? The call is particularly significant for two main reasons. One, at that point, it's a nexus between Armstrong and Ray-Ban. So now the officers, anything that they suspected about Armstrong can, to some degree, be imputed to Ray-Ban because we've got physical presence, we've got a phone call happening, so that ties the two of them together. The other, the phone call is itself significant. If you look at Officer Danielson's testimony, he has had experience. He testified to experience where when you stop a gang, where he had stopped gang members, and in his words, phones start ringing, the next thing you know, officers are outnumbered and overwhelmed as other gang members show up to try to disrupt the stop. That was his personal experience. So that phone call itself is generating suspicion. And then, of course, you have Mr. Armstrong's behavior during the stop, staring at the officers, what they call grilling, mean mugging. Again, all of this, none of this is post hoc. I mean, you can watch these videos. You can see the tension in the officers when Armstrong arrives. You can see Officer Moldenhauer's head pop up when he recognizes him. He nods at him. He tells another officer the whole reason they called for additional backup was because he, Armstrong, was here. So really, Armstrong's arrival elevates this far beyond a typical traffic stop and provides significant reasonable suspicion. The fourth factor is the ankle monitor. I certainly agree that's the least weighty of the factors here, but it reflects recent criminal history. It reflects that, for some reason, Mr. Raban is under judicial supervision right now, be that pretrial, be that supervised release, but it reflects recent criminal history, which, in combination with all of these factors in their totality, reflects reasonable suspicion. So I think the dangerousness finding was very well supported by the record. And then on the access to weapons prong, I mean, we've already talked about. Let me just interrupt you on that with the introduction to that. The district court, of course, reversed itself on credibility, and originally it said it found the officer to be not credible, that the officer would not have let this person back to the car, and then switch that after, I think, he knew the criminal history of the person, which I'm not sure how that would tie to his not getting back to the car. I don't think they could arrest him for his criminal history. But if that's determinative, that if he has high criminal history, then he's not going to get back to the car, which is what the district court reasoning was, then here's my concern. My concern is that it becomes a race. Let's hurry and go protective search before we find out that the criminal history is one way or the other. In other words, they didn't have to do that protective search that instant. They could have waited for the criminal history. In fact, it came in as Danielson was going to do the protective search. And so what about that concern? That's just bad policy to have a race to the car to see who can protective search before all the information is learned. Well, Your Honor, I certainly agree that the course of proceedings here, the district court's reconsideration, it ultimately is confusing, and I can't really gainsay that. I think, first and foremost, the court ended up in exactly the correct position, which is, you know, these officers testimony was he was going to be released. There's nothing raising a question about that. And the court believed that testimony. Now, I mean, the way that the court explained was released when he was released. Then after that moment, did the officers have any ability to search the car after that? Well, I think that I don't think that's a question that long answers, Your Honor. I think that long is concerned with sweeps that occur during the course of a Terry investigated detention. I think if he if they have said, OK, you're free to go and started getting back in their cars. I think that may have been a different case. But that's simply not what happened here. And I think that long concerns protective sweeps during the Terry detention. And I think to judge Phillips question on the reconsideration, I, too, am not entirely clear on why criminal history in the district court's view would have made a difference. I don't think this court needs to be concerned with that, because ultimately, the district court disavowed that position. The district court, you know, as I said, ultimately reached the correct the correct location. Frankly, I think that had they run had they known the results of the criminal history check, I don't think that would have had a dispositive outcome on his ability to return to the vehicle. So I think according to the district court would have the district court said if he had known the criminal history, he wouldn't have gotten back to the car. The district court didn't recount on that. The district court changed its mind based on its realizing that Danielson didn't know the criminal history. I mean, that is what the court said, Your Honor. I don't think the court explained why that was the case. And I don't think that that's, again, something that this court ultimately needs to dive down because because I mean, I agree, Your Honor, you're concerned about a race for criminal history. That's a significant concern. But but personally, I don't I don't believe that knowledge of his criminal history would have definitively settled the release after the detention. Now, I will also say we've also argued the break free prong. And I understand that the district courts held that the probability of his breaking free was low. I think that is an answer to the wrong question. It's ultimately that prong is not about the actual chance that a defendant or a suspect will break free. It's about the possibility that they might. And if you look at long, if you look at this court's decisions in Denison, Alexander, Palmer, the defense, the suspects there were significantly more restrained than Mr. Rayban was here. I mean, Rayban was surrounded by was it six other officers? Whatever the number was, it was a very large number of officers on the scene. There there were six officers total that responded to this call in any given moment. It's unclear how many were close to Rayban. But I mean, I think that the measuring stick here really needs to be Denison. In Denison, the suspect was handcuffed in the back of the squad car. And this court still held that there was a possibility that he could break free. Although he was handcuffed at the rear of the car in Palmer, he was in the rear of the squad car. So if those cases meet this requirement, so does Raybans. I see I'm over your time, your honor. So if the court has no further questions, we ask that the suppression order be affirmed. Thank you, counsel. Yes, so just a couple of brief points in reply. You know, I don't think there's there's really no factual disputes here. Right. We all agree on what the facts are. We all agree on what the factors are. The problem for the district court's ruling is that nowhere in the there are no cases cited by the district court or by the government that this quantum of generalized facts support a reasonable suspicion to believe that someone is armed and dangerous. So beyond the Hammond case that I mentioned, I think it's important to look at look at Canada where you have the individual's furtive movements and a slow roll of failure to stop when confronted with law enforcement that there was testimony was indicative of obtaining or hiding a weapon. Right. In Garcia, you have a defendant with a prior armed robbery conviction who 2 weeks prior had been involved in an assault with that officer in Denison. Right. You have a passenger with a felony arrest warrant for weapons violation and a domestic dispute that very evening. In all of these cases, you have something that is individualized in particularized as to the individual being stopped, likely being dangerous and likely being armed. Can I just I really appreciate the list here, but I'm, I'm wondering if you can directly speak to the phone call. You haven't what do we do with the phone call and the brother? I don't think the phone call really adds anything to the analysis. At most, it shows that there's a connection between the 2 men and Mr. Raven acknowledged as much. He said, yeah, that's my girlfriend's brother across the street. So the phone call doesn't really. What about the possibility that your opponent is suggesting that the phone start ringing and then people start appearing? I mean, that's maybe not. Particularized to meet your standard, but I'm wondering if you could at least speak to it. Sure, I mean, I think that phone start ringing and other people may appear at the scene wouldn't be true if Mr Armstrong is calling Mr Raven while he's particularly let alone that they're going to plan some sort of something in front of the officers who are literally watching him have that call and saying hello to Mr Armstrong across the street. I see him out of time. I can just briefly finish responding. I think at base, what Mr Armstrong's presence ads is a connection is essentially just a bootstrapping, right? The idea of gain affiliation, which we know is not enough from Hammond and is imputing right a sense of suspicion from 1 to another. That is just not what we do under the 4th amendment as far back as a basic principle in a bar. And for those reasons, I'm out of time. The court has no further questions. I'd simply ask you to reverse the district court's ruling. Seeing no further questions, thank you counsel for your arguments. The case is submitted and counselor excuse.